# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GOLDEN CORRAL CORPORATION<br><br>            Plaintiff,<br><br>v.<br><br>PILGRIM'S     PRIDE     CORPORATION NORMAN W. FRIES, INC. d/b/a CLAXTON POULTRY FARMS, INC.; GEORGE'S, INC.; and GEORGE'S FARMS, INC.;<br><br>            Defendants. | **COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Golden Corral Corporation ("Golden Corral"), brings this action for damages under the antitrust laws of the United States against Pilgrim's Pride Corporation ("Pilgrim's Pride");Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. ("Claxton"); George's, Inc.; and George's Farms, Inc.; (together with George's, Inc., "George's") (Pilgrim's Pride, Claxton, and George's are collectively, the "Defendants"), and alleges:

## I. INTRODUCTION

1. Defendants are horizontal competitors in the United States chicken market. Defendants and their co-conspirators conducted a long-running conspiracy (the "Conspiracy") extending from at least as early as January 2008 through at least as late as 2019 (the "Conspiracy Period") to restrain production, manipulate price indices, fix prices and rig bids, the purpose and effect of which was to fix, raise, stabilize and maintain prices of chicken meat throughout the United States.

2. Chickens raised for meat consumption ("Broilers" or "Broiler")[1] constitute approximately 98% of all chicken meat sold in the United States. Defendants are the leading suppliers of Broilers and control approximately 90% of the wholesale Broiler market. The Broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.

3. The commoditized nature of Broilers, in conjunction with the (a) significantly high barriers to entry, (b) access to competitors' commercially sensitive data, (c) highly concentrated market dominated by vertically-integrated producers, (d) inelastic demand for the product, and (e) opportunities to conspire at trade association meetings, investor conferences, competitor plant tours, and other contacts among competitors made the Broiler industry particularly susceptible to

---

[1] Broiler chickens specifically refer to chickens raised for meat consumption to be slaughtered before the age of 10–13 weeks. Broilers can be sold fresh or frozen, raw or cooked, or whole or in parts, or as a meat ingredient in a value added product.

anticompetitive manipulation. These factors, among others, enabled Defendants to effectively conspire to inflate the prices of Broilers above those that would prevail in a competitive market.

4.      In 2007, the price of Broilers decreased. As a result—commencing as early as January 2008 and continuing throughout the Conspiracy Period—Defendants conspired to curtail competition in the market for Broilers by reducing and misrepresenting the supply of Broilers, manipulating the price indices for wholesale Broilers, and fixing prices and rigging bids for Broilers.

5.      Defendants used multiple means to sustain the Conspiracy. First, beginning in 2008, Defendants engaged in a series of coordinated supply reductions at the start of the distribution chain. Defendants purposefully destroyed breeder hens and eggs to achieve these artificial decreases in Broiler supply. Defendants then used the reduced supply of Broilers to justify market-wide price increases. Later in the Conspiracy Period, Defendants capitalized on their prior actual reduction of Broilers to coordinate a false supply reduction, again with the same goal—to use the perceived reduction of supply to justify price increases of Broilers.

6.       Defendants also manipulated the price indices associated with wholesale Broiler prices—particularly the Georgia Dock price index. Defendants then used the artificially inflated price indices again to effectuate inflated non-competitive prices to purchasers of Broilers. In furtherance of the Conspiracy, Defendants reached anti-competitive agreements and understandings through direct communications and during regularly scheduled trade association meetings, investor conferences, competitor plant tours, and other contacts with one another.

7.      Defendants also coordinated their strategy for achieving their desired anti-competitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of Broilers. As part of this strategy, Defendants exchanged

information regarding anticipated future production through Agri Stats, Inc. ("Agri Stats"). Defendants used this data to coordinate production outputs, monitor each other's production figures for Broilers, and otherwise facilitate the Conspiracy.

8.     Defendants also engaged in a bid-rigging conduct targeted at restaurants and others that purchased Broilers in large volumes.  Starting at least as early as 2012 and continuing until at least as late as 2019 (the "Bid-Rigging Conduct Period"), Defendants conspired to submit artificially high bids to Quick Service Restaurants ("QSRs") and others in an effort to drive up prices, and in turn, Defendants' profits.

9.     Golden Corral, like many restaurants, contracted directly with Defendants for the purchase of their chicken products.  Defendants used their coordinated manipulation of the wholesale price indices and their coordinated actual and false supply reductions of Broilers to enter into contracts to supply the Golden Corral system with Broilers at artificially inflated prices.

10.     As a result of Defendants' price-fixing and bid-rigging conduct, Defendants were able to exact significant price increases from Golden Corral and other restaurants.  Defendants adhered to their collusive agreements and understandings throughout the Conspiracy Period. Defendants reaped the benefits of their illegal conduct through their production and sale—directly and through their wholly-owned or controlled subsidiaries and affiliates—of Broilers at inflated non-competitive prices.  Through their collusive, anticompetitive actions, Defendants negated the economic benefits of increased competition.  Defendants' conduct resulted in their customers, including Golden Corral, paying millions of dollars in overcharges to Defendants.

11.     Defendants concealed their anticompetitive and unlawful conduct from their customers, regulators, and the public.  For instance, it was not publicly known until November 2016 that certain Defendants and their co-conspirators manipulated and artificially inflated the

3

Georgia Dock price index. And, it was not until June 2020—as a result of the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride—that a portion of Defendants' bid-rigging conduct involving Broilers sold to restaurants was revealed. It was not until October 7, 2020—when the Department of Justice issued its Superseding Indictment of six additional executives of Tyson, Koch, Pilgrim's Pride, and George's—that additional elements of Defendants' bid-rigging conduct involving Broilers were revealed.

12.    "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. Numerous "plus factors" existed in the Broiler industry during the Conspiracy Period including, but not limited to: (i) direct communications between Defendants regarding confidential production information which allowed Defendants to disseminate actual and false information regarding supply reductions to purchasers of Broilers; (ii) coordinated manipulation by Defendants of the Georgia Dock price index; (iii) Defendants' coordinated conduct to rig bids to restaurants and other contact purchasers of Broilers; (iv) extensive information sharing through Agri Stats and other means; (v) numerous opportunities for Defendants to collude in a variety of forums; (vi) inter-Defendant trades and purchases that often were against independent self-interest; (vii) increased exports of Broilers to other countries that were also often against independent self-interest; and (viii) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, depressed economic conditions, and a history of government investigations and collusive conduct..

## II.  PARTIES

4

### A.  Plaintiff

13.  Golden Corral Corporation is a North Carolina corporation with its principal place of business in Raleigh, North Carolina.  During the Conspiracy Period, over 400 Golden Corral branded restaurants operated in multiple states.

14.  Restaurants like Golden Corral serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Golden Corral, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Golden Corral's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Golden Corral with Broilers.

15.  Golden Corral provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Golden Corral's products and specific requirements for packaging and labeling Golden Corral proprietary products.

16.  The contracts entered into between Golden Corral and certain Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Golden Corral.

17.  Golden Corral brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor").

18.  During the Conspiracy Period, Golden Corral purchased Broilers directly from certain Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators.

19.     Also during the Conspiracy Period, McLane purchased Broilers on Golden Corral's behalf from Defendants and/or their co-conspirators.  McLane has assigned its claims arising out of these purchases to Golden Corral.

20.     Golden Corral and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period.  Golden Corral contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Golden Corral with Broilers.  As such, Golden Corral has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

21.     Golden Corral was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers.  Golden Corral brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

    **B.     Defendants**

    (i)     Pilgrim's Pride

22.     Defendant Pilgrim's Pride Corporation is a publicly held Delaware corporation headquartered in Greeley, Colorado.

23.     In December 2008, Pilgrim's Pride filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas.  Effective December 28, 2009, Pilgrim's Pride was discharged from bankruptcy under a plan of reorganization that paid all creditors in full largely due to rising Broiler prices leading to increased profits at Pilgrim's Pride.

24.     After its discharge from bankruptcy, Pilgrim's Pride reaffirmed its participation in the Conspiracy.

25.     Accordingly, Pilgrim's Pride is liable for all conspiratorial acts undertaken during the entire Conspiracy Period.

26.     During the Conspiracy Period, Pilgrim's Pride, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

27.     Pilgrim's Pride reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Pilgrim's Pride submitted false and artificially inflated price quotes to the GDA.  Pilgrim's Pride's Executive Vice President of Sales and Operations served on the Georgia Dock Advisory Board.

(ii)     Claxton

28.     Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation headquartered in Claxton, Georgia.

29.     During the Conspiracy Period, Claxton, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

30.     Claxton reported to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex.  Claxton submitted false and artificially inflated price quotes to the GDA. Its CEO served on the Georgia Dock Advisory Board.

(iii)     George's

31.     Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

32.     Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. George's Farms, Inc. is a wholly-owned subsidiary of

George's, Inc.

33.     Defendants George's, Inc. and George's Farms, Inc. are together referred to as "George's."  During the Conspiracy Period, George's, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

34.     George's reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

## III.     CO-CONSPIRATORS

35.     Various companies not named as Defendants also performed acts and made statements in furtherance of the Conspiracy.   These co-conspirators who are not named as Defendants include the following:

### A.     Tyson

36.     Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

37.     Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Chicken, Inc. is a wholly-owned subsidiary of Tyson Foods, Inc.

38.     Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Breeders, Inc. is a wholly-owned subsidiary of Tyson Foods, Inc.

39.     Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Poultry, Inc. is a wholly-owned subsidiary of Tyson Foods, Inc.

40.     Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters

in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc.

41.     Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc., and Tyson Sales and Distribution, Inc. are collectively referred to as "Tyson."  During the Conspiracy Period, Tyson, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

42.     Tyson reported a wide variety of data to Agri Stats including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky.  Tyson submitted false and artificially inflated price quotes to the Georgia Department of Agriculture ("GDA").  One of Tyson's plant managers served on the Georgia Dock Advisory Board.

**B.     Koch**

43.     Koch Foods, Inc. is a privately held Delaware corporation headquartered in Park Ridge, Illinois.

44.     JCG Foods of Alabama, LLC is an Alabama limited liability corporation headquartered in Park Ridge, Illinois.  JCG Foods of Alabama, LLC is a wholly-owned subsidiary of Koch Foods, Inc.

45.     JCG Foods of Georgia, LLC is a Georgia limited liability corporation headquartered in Park Ridge, Illinois.  JCG Foods of Alabama, LLC is a wholly-owned subsidiary of Koch Foods, Inc.

46.     Koch Meat Co., Inc. is an Illinois corporation headquartered in Chicago.  Koch Meat Co., Inc. is a wholly-owned subsidiary of Koch Foods, Inc.

47. JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

48. JCG Properties, L.L.C. is an Illinois limited liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

49. JCG Land Holdings, LLC is an Illinois limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

50. JCG Foods LLC is a Delaware limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

51. Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.

52. Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.

53. JCG Farms of Georgia LLC is a Georgia limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

54. Koch Foods of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

55. Koch Farms of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

56. Koch Freezers LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

57. Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited

liability company with its headquarters in Morton, Mississippi, and was a wholly-owned subsidiary of Koch Foods, Inc.

58.     Koch Foods of Alabama LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

59.     JCG Farms of Alabama LLC is an Alabama limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

60.     Koch Foods of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

61.     Koch Farms of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

62.     Koch Farms of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

63.     Koch Foods of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

64.     Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc.

65.     Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly- owned subsidiary of Koch Foods, Inc.

66.     Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, Koch Meat Co., Inc., JCG Industries, Inc., JCG Properties, L.L.C., JCG Land Holdings, LLC, JCG Foods LLC, Koch Foods of Cumming LLC, Koch Foods of Gainesville LLC, JCG Farms of Georgia

11

LLC, Koch Foods of Mississippi LLC, Koch Farms of Mississippi LLC, Koch Freezers LLC, Koch Properties of Mississippi LLC, Koch Foods of Alabama LLC, JCG Farms of Alabama LLC, Koch Foods of Ashland LLC, Koch Farms of Ashland LLC, Koch Farms of Gadsden LLC, Koch Foods of Gadsden LLC, Koch Foods of Cincinnati LLC, and Koch Foods LLC are collectively referred to as "Koch."

67.     During the Conspiracy Period, Koch, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

68.     Koch reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama.  Koch, through JCG Foods of Georgia, LLC, submitted false and artificially inflated price quotes to the GDA.  Koch's Vice-President of Sales served on the Georgia Dock Advisory Board.

### C.     Sanderson Farms

69.     Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

70.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation headquartered in Laurel, Mississippi.  Sanderson Farms, Inc. (Foods Division) is a wholly-owned subsidiary of Sanderson Farms, Inc.

71.     Sanderson Farms, Inc. (Production Division) is a Mississippi corporation headquartered in Laurel, Mississippi.  Sanderson Farms, Inc. (Production Division) is a wholly-owned subsidiary of Sanderson Farms, Inc.

72.     Sanderson Farms, Inc. (Processing Division), a Mississippi corporation

12

headquartered in Laurel, Mississippi. Sanderson Farms, Inc. (Processing Division) is a wholly-owned subsidiary of Sanderson Farms, Inc.

73.     Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms." During the Conspiracy Period, Sanderson Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

74.     Sanderson Farms reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Sanderson Farms submitted false and artificially inflated price quotes to the GDA.

### D.     Raeford

75.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.

76.     House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of House of Raeford Farms, Inc.

77.     Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of House of Raeford Farms, Inc.

78.     Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly-owned subsidiary of House of Raeford Farms, Inc.

79.     Raeford Farms of Louisiana, L.L.C. is a Louisiana limited liability company with

its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of House of Raeford Farms, Inc.

80.     Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of House of Raeford Farms, Inc.

81.     House of Raeford Farms, Inc., House of Raeford Farms of Louisiana, L.L.C., Johnson Breeders, Inc., Columbia Farms of Georgia, Inc., Raeford Farms of Louisiana, L.L.C., and Columbia Farms, Inc. are collectively referred to as "Raeford." During the Conspiracy Period, Raeford, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

82.     Raeford reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

### E.     Mar-Jac

83.     Mar-Jac Poultry, Inc. is a Georgia corporation headquartered in Gainesville, Georgia. Mar-Jac Poultry, Inc. and its subsidiaries are controlled by Sterling Management Group, Inc.

84.     Mar-Jac Poultry MS, LLC is a Mississippi limited liability company located in Gainesville, Georgia.

85.     Mar-Jac Poultry AL, LLC is an Alabama limited liability company located in Gainesville, Georgia.

86.     Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia.

87.     Mar-Jac Poultry, LLC is a Delaware limited liability company located in Gainesville, Georgia.

88.     Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia

14

and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC (collectively, "Mar-Jac").

89.     During the Conspiracy Period, Mar-Jac, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

90.     Mar-Jac reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex.  Mar-Jac submitted false and artificially inflated price quotes to the GDA.  Mar-Jac's Vice President of Operations served on the Georgia Dock Advisory Board.

F.     Perdue

91.     Perdue Farms Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

92.     Perdue Foods LLC, formerly known as Perdue Farms LLC, is a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland.  Perdue Foods LLC is a subsidiary of Perdue Farms Inc.

93.     Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly-owned subsidiary of Perdue Farms Inc.

94.     Harvestland Holdings, LLC was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.

95.     Perdue Food Products, Inc. was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.

96.     Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned

subsidiary of Perdue Farms Inc.

97.     Perdue Farms Inc., Perdue Foods LLC, Perdue Foods, Inc., Harvestland Holdings, LLC, Perdue Food Products, Inc., and Perdue Farms Incorporated are together referred to as "Perdue."  During the Conspiracy Period, Perdue, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

98.     Perdue reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.  Perdue submitted false and artificially inflated price quotes to the GDA.

### G.     Wayne Farms

99.     Wayne Farms, LLC is a Delaware limited liability corporation headquartered in Oakwood, Georgia.

100.     WFSP Foods, LLC is a Georgia limited liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Wayne Farms, LLC.

101.     Wayne Farms, LLC and WFSP Foods, LLC are together referred to as "Wayne Farms."  During the Conspiracy Period, Wayne Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

102.     Wayne Farms reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Wayne Farms submitted false and artificially inflated price quotes to the GDA.  Its Vice President of Fresh Sales served on the Georgia Dock

Advisory Board.

### H. Fieldale Farms

103. Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia.

104. During the Conspiracy Period, Fieldale, its predecessors, subsidiaries, or affiliates, sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

105. Fieldale reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Fieldale submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Board.

### I. Simmons

106. Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

107. Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc.

108. During the Conspiracy Period, Simmons Foods, Inc. exclusively sold the Broilers it produced to Simmons Prepared Foods, Inc., which in turn resold the Broilers in various forms to its customers. Simmons Foods, Inc., its predecessors, subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its

owned or controlled subsidiaries and affiliates, to purchasers in the United States. Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons."

### J. O.K. Foods

109. O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

110. O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Farms, Inc. is a wholly-owned subsidiary of O.K. Foods, Inc.

111. O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Industries, Inc. is a wholly-owned subsidiary of O.K. Foods, Inc.

112. O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of O.K. Foods, Inc.

113. O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., O.K. Broiler Farms Limited Partnership and their predecessors, subsidiaries, and affiliates, including Albertville Quality Foods, are collectively referred to as "O.K. Foods." During the Conspiracy Period, O.K. Foods sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

114. The O.K. Foods entities are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco. O.K. Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

### K. Peco Foods

115. Peco Foods, Inc. is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.

116. Peco Farms of Mississippi, LLC is a Mississippi limited liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Peco Foods, Inc.

117. Peco Foods, Inc. and Peco Farms of Mississippi, LLC are together referred to as "Peco Foods." During the Conspiracy Period, Peco Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

118. Peco Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

### L.     Harrison

119. Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia.

120. During the Conspiracy Period, Harrison, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

121. Harrison reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Harrison submitted false and artificially inflated price quotes to the GDA. Harrison's owner and CEO served on the Georgia Dock Advisory Board.

### M.     Foster Farms

122. Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. Foster reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California,

Livingston, California, and the Pacific Northwest.

123.    Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms, LLC.

124.    Napoleon Poultry Supply LLC is a Delaware limited liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Foster Farms, LLC.

125.    Foster Farms, LLC, Foster Poultry Farms, and Napoleon Poultry Supply LLC are collectively referred to as "Foster Farms."  During the Conspiracy Period, Foster Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### N.    Mountaire Farms

126.    Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

127.    Mountaire Farms, LLC is a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas.  Mountaire Farms, LLC is a wholly-owned subsidiary of Mountaire Farms, Inc.

128.    Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.  Mountaire Farms of Delaware is a wholly-owned subsidiary of Mountaire Farms, Inc.

129.    Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms."  During the Conspiracy Period, Mountaire Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

130.    Mountaire Farms reported a wide variety of data to Agri Stats, including

information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

### O.     Amick

131.    Amick Farms, LLC ("Amick") is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and with facilities in South Carolina, Maryland and Delaware. Amick is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois.

132.    During the Conspiracy Period, Amick, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

133.    Amick reported a wide variety of data to Agri Stats, including information about its breeder flocks, hatchery capacity, and processing complexes.

### P.     Case Foods

134.    Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Conspiracy Period, Case Foods, Inc., its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

135.    Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc. During the Conspiracy Period, Case Farms, LLC, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to

purchasers in the United States.

136.    Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina.  Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc.  During the Conspiracy Period, Case Farms Processing, Inc., its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

137.    Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. are collectively referred to as "Case Foods."  During the Conspiracy Period, Case Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

138.    Case Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks, hatchery capacity, and processing complexes.

> ### Q.    Allen Harim

139.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware.

140.    Allen Harim Foods, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA, Ltd.

141.    Allen Harim Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina.  Allen Harim Farms, LLC is a wholly-owned subsidiary

of Harim USA, Ltd.

142.    Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim."   During the Conspiracy Period, Allen Harim, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### R.    Keystone Foods

143.    Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig"). On November 30, 2018, Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig. Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities.

144.    Tyson Foods' acquisition of Keystone Foods LLC (and of the three affiliated Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all of Keystone Foods LLC's assets and liabilities, and that Keystone Foods LLC continued to exist as an operating entity subsequent to the acquisition.

145.    Equity Group Eufala Division, LLC is a Delaware limited liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods, LLC.

146.    Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky and is a wholly-owned subsidiary of Grow-Out Holdings, LLC.

147.    Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia and is a wholly-owned subsidiary of Keystone Foods, LLC.

148.    As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC.

149.    Keystone Foods, LLC, Keystone Foods Corporation, Equity Group Eufala Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods."

150.    During the Conspiracy Period, Keystone Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States

### S.    Marshall Durbin

151.    Marshall Durbin Companies and Marshall Durbin Food Corporation ("Marshall Durbin") was a poultry company headquartered in Birmingham, Alabama.  Its assets included poultry processing plants in Hattiesburg, Mississippi, and Jasper, Alabama; feed mills in Haleyville, Alabama, and Waynesboro, Mississippi; hatcheries in Moulton, Alabama, and Waynesboro, Mississippi; a laboratory in Jackson, Mississippi; and a distribution center in Tarrant, Alabama.

152.    On January 24, 2014, Mar-Jac announced that it had acquired the assets of Marshall-Durbin.  Mar-Jac stated that its management team "expects a smooth transition with no disruption of operations."  During the Conspiracy Period, Marshall Durbin, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States

153.    Tyson, Koch, Sanderson Farms, Raeford, Mar-Jac, Perdue, Wayne Farms, Fieldale, Simmons, O.K. Foods, Peco Foods, Harrison, Foster Farms, Mountaire Farms, Amick, Case

Foods, Allen Harim, Keystone Foods, and Marshall Durbin are collectively referred to as the "Producer Co-Conspirators."

**T.      The Pilgrim's Pride Family Co-Conspirators**

154.    Various subsidiaries and related entities of the Pilgrim's Pride family named herein actively participated in the Conspiracy and therefore are co-conspirators, including the following:

155.    PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

156.    Merit Provisions, LLC is a Texas limited liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

157.    GC Properties, LLC is a Georgia limited liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

158.    Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

159.    PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

160.    Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

161.    During the Conspiracy Period, each of the Pilgrim's Pride family co-conspirators identified above sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**U.  The George's Family Co-Conspirators**

162. Various subsidiaries and related entities of the George's family named herein actively participated in the Conspiracy and therefore are co-conspirators, including the following:

163. George's Chicken, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc.

164. George's Family Farms, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia and is a wholly-owned subsidiary of Defendant George's, Inc.

165. George's Foods, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc.

166. George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.

167. George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.

168. During the Conspiracy Period, each of the George's family co-conspirators identified above sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**V. Agri Stats**

169. Agri Stats, Inc. is an Indiana corporation headquartered in Fort Wayne, Indiana. Agri Stats is a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.

170. Agri Stats knowingly played an important and active role in Defendants' collusive scheme. Agri Stats used the instrumentalities of interstate commerce to facilitate the Conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.

171.    Agri Stats profited by its participation in the Conspiracy through its receipt of payments from Defendants of a share of the revenues earned from artificially supracompetitive prices charged for Broilers as a result of the Conspiracy.  This resulted in Agri Stats collecting hundreds of thousands of dollars annually from Defendants.

172.    In 2008 and 2010—two key periods in the Conspiracy—a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations.

173.    Several Conspirators, including Wayne Farms and Pilgrim's Pride, hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of Defendants.

174.    Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the Conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.  Throughout this Complaint, the Producer Co-Conspirators, the Pilgrim's Pride and George's family co-conspirators identified above, Agri-Stats, and the other persons, firms, and corporations not named as defendants that performed acts and made statements in furtherance of the Conspiracy are collectively referred to as "Co-Conspirators."

175.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

176.    Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

177.    Defendants are also liable for acts done in furtherance of the alleged Conspiracy by companies they acquired through mergers or acquisitions.

## IV.    JURISDICTION AND VENUE

178.    Golden Corral brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' Conspiracy to restrain trade.

179.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a).

180.    Venue is proper in the Northern District of Illinois under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. §§ 1391(b) because: (i) Defendants resided, transacted business, were found, or had agents in this District during the Conspiracy Period, (ii) a substantial portion of the events giving rise to Golden Corral's claim occurred in this District, or (iii) a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce during the Conspiracy Period was carried out in this District.

181.    This Court has jurisdiction over each Defendant named in this action, as Defendants transact business in the state of Illinois.  Further, Defendants have substantial contacts in Illinois and engaged in a Conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business of persons and entities residing in, located in, or doing business in Illinois.

## V.    TRADE AND COMMERCE

182.    During the Conspiracy Period, Defendants and their Co-Conspirators collectively controlled the market for Broilers in the United States.

183.    The activities of Defendants and their Co-Conspirators, as described herein, were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States trade or commerce.

184.    Each Defendant or Co-Conspirator, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their Conspiracy.  Specifically, during the Conspiracy Period, each Defendant and Co-Conspirator, directly, or through one or more of its parents, affiliates, subsidiaries, or business units, knowingly and intentionally produced, shipped, and sold or delivered Broilers to United States purchasers, including Golden Corral, in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

185.    Defendants' and their Co-Conspirators' Conspiracy directly and substantially affected the price of Broilers purchased by Golden Corral during the Conspiracy Period.  Such conduct was meant to produce, and did in fact produce, a substantial harmful effect on interstate commerce in the form of artificially high prices paid for Broilers by customers, including Golden Corral, during the Conspiracy Period.

186.    Defendants' and their Co-Conspirators' Conspiracy proximately caused antitrust injury to Golden Corral in the form of the supracompetitive prices it paid for Broilers during the Conspiracy Period, and gives rise to Golden Corral's antitrust claims.

## VI.        OVERVIEW OF THE BROILER INDUSTRY

### A.        Broilers are a Commodity

187.    According to a 2012 report by Focus Management Group, Broilers are "a commodity product with little or no product differentiation based on the processors."  Defendants acknowledge that Broilers are a commodity.  For instance, Pilgrim's Pride's CEO commented in February 2014 that "the chicken business per se is a commodity business."

188.    The commoditized nature of Broilers is evidenced by the fact that numerous

Defendants purchased Broilers from each other to absorb excess supply in the market during the Conspiracy Period, and in turn, further their Conspiracy.

189.    There is a lack of differentiation among Broiler suppliers because virtually all suppliers sell USDA Grade A chicken.  As a result of the lack of product differentiation, Defendants were forced to compete on price (absent collusion) such that the supply decisions of each Broiler producer impacted the market price for Broilers.

190.    While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole.  Thus, the commoditized nature of Broilers facilitates the implementation of a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.

**B.      The United States Broiler Market is a National Market Worth Tens of Billions of Dollars Annually**

191.    According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

192.    Exports of Broilers from the United States account for approximately 45% of all United States meat exports.  Broilers produced in the U.S. are exported to well over 100 different countries, with the major export markets including Mexico, Canada, Hong Kong, and China.  Some of the exports from the United States include products less desirable to United States consumers, such as chicken feet or dark meat, but exports also increasingly include white meats and other products widely consumed in the United States.

193.    While this Complaint does not seek damages for Broilers sold into export commerce, Broilers exported from the United States decrease available supply and increase Broiler

prices in the United States. Therefore, exports by Defendants were an important mechanism used by Defendants to effectuate their United States-based Broiler market conspiracy.

C. **Defendants and their Co-Conspirators Control the Highly Concentrated Broiler Industry**

194. During the Conspiracy Period, Defendants and their Co-Conspirators collectively controlled nearly 90% of the single national market for Broilers in the United States. The Broiler industry was almost entirely vertically integrated, with producers owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing and feeding, slaughtering mature birds, processing, and selling of Broilers.

195. At the top of the supply chain are Defendants' and the Co-Conspirators' "breeder flocks," which include the hens that lay the eggs that, when hatched, become Broilers.

196. Once Defendants' and the Co-Conspirators' Broilers reach maturity, they are processed. Per the USDA, "processing is the term used by the poultry industry to describe the conversion of live poultry into raw poultry products fit for human consumption."

197. While some Broilers are sold without any further processing, some Broilers are sent to affiliated companies for further processing, which, per the U.S. Poultry & Egg Association, is where "[t]he whole carcass or cut-up and deboned pieces are further processed for added value," (i.e., pre-marinated chicken). Defendants' and the Co-Conspirators' Conspiracy involved both pure chicken and value-added products.

198. In 2010, agriculture economist Dr. Michael Dicks observed that vertical integration in the U.S. poultry industry incentivizes producers of Broilers to implement supply restrictions, stating "vertical coordination allows integrators to manage excess capacity to manage price . . . . Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

199.    There were high barriers to entry into the market for Broilers.  A new entrant into the market would face significant start-up costs, including multi-million dollar costs associated with research and development, construction of processing complexes, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure, skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals for environmental, worker safety, and food safety issues.

200.    Prices for Broilers sold in the United States were quoted in "whole bird" or disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

201.    Defendants and the Co-Conspirators sell both small and large Broilers.[2]  Small Birds (generally 4.25 pounds or less) are purchased primarily by restaurants.  Birds larger than 4.25 pounds, by contrast, generally are sold in tray pack or bagged form for sale in the retail and grocery channel.

### D.    The Broiler Industry Was Previously Subject to Antitrust Litigation

202.    In 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix prices and restrict the production of Broilers in violation of United States antitrust laws.  That conspiracy involved a conference call program where NBMA members (and even some non-members) coordinated the pricing and production of Broilers.  In response, numerous private civil antitrust actions were filed against NBMA and 42 individual defendants in the *In re Chicken*

---

[2] Upon information and belief, Sanderson Farms, Foster Farms, Harrison, and Peco Foods did not produce Small Birds during the alleged bid-rigging conduct period, and Raeford has not produced Small Birds since mid-2012, the beginning of the bid-rigging conduct period.

*Antitrust Litigation* case. The NBMA and the other Broiler producer defendants eventually settled the case for approximately $30 million.

203. More recently, several cases brought by contract-farmers against integrated Broiler producers have alleged violations of the Packers and Stockyards Act, including *Adams v. Pilgrim's Pride*, No. 2:09-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.). These cases also suggest an absence of true competition among Defendants in the Broiler industry.

## VII. FACTUAL ALLEGATIONS REGARDING DEFENDANTS' CONSPIRACY

### A. Defendants' Coordinated Conduct to Restrict the Supply of Broilers

204. Defendants' and the Co-Conspirators' Conspiracy amounted to a modernized version of the antitrust conspiracy perpetrated in the chicken industry during the 1970s.

205. The modern-day version of Defendants' and the Co-Conspirators' Conspiracy was instigated by an attempt by Pilgrim's Pride and Tyson in 2007 to raise industry prices by cutting their production levels. Despite their combined 40% market share, Pilgrim's Pride's and Tyson's 2007 production cuts were not enough to increase prices.

206. As a result, in January 2008 Pilgrim's Pride and Tyson changed tactics. Realizing that their actions alone were not enough, they sought broader cooperation to increase Broiler prices. In January 2008, both Pilgrim's Pride and Tyson stated to the Broiler industry that the companies would not continue to cut production. A few days after attending an industry event in late January 2008, however, Tyson's CEO announced that Tyson had "no choice [but] to raise prices substantially." And, only a day later, a Pilgrim's Pride executive announced publicly that Pilgrim's Pride would be cutting its production and "the rest [] of the market is going to have to pickup a fair share in order for the production to come out of the system."

207. The other Defendants and Co-Conspirators joined Pilgrim's Pride and Tyson's

plan, making substantial cuts to their own production.

208. Defendants and the Co-Conspirators then went even further. Historically, when faced with low market prices, Defendants relied primarily on short-term production cuts at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants. These mechanisms allowed Defendants and the Co-Conspirators to increase production within weeks if prices for Broilers subsequently rose.

209. Here, Defendants and the Co-Conspirators purposefully inhibited their ability to ramp up production for 18 months or more by destroying breeder hens in their breeder flocks responsible for supplying the eggs Defendants and the Co-Conspirators raise into Broilers. This destruction of the breeder flocks was unprecedented and the consequences reverberated in the Broiler industry.

210. Through press releases, earnings, investor calls and at investment bank conferences, events hosted by Agri Stats, and trade association meetings attended by many of their senior-most executives, Defendants and the Co-Conspirators preached that oversupply was decimating industry profits, and increased supply-side "discipline" was needed to halt the downward trajectory of prices for Broilers.

211. Nearly all Defendants and the Co-Conspirators were members of the following Broiler industry trade associations: National Chicken Council, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing Broiler producers in Arkansas, Missouri, and Oklahoma). Participation in these trade associations—regularly by Defendants' and the Co-Conspirators top level executives—provided Defendants and the Co-Conspirators with opportunities to share information and coordinate the Conspiracy.

212.   Defendants' and the Co-Conspirators senior executives participated in numerous investor conferences each year, providing further opportunities to meet and communicate with one another.  Such conferences included the Goldman Sachs Global Staples Forum, Bank of America Merrill Lynch Global Agriculture Conference, BMO Capital Markets Annual Ag & Protein Conference, BMO Capital Markets Conference, BMO Farm to Market Conference, Urner Barry Annual Executive Conference and Marketing Seminar, and JP Morgan Basic Materials Conference.

213.   Defendants and the Co-Conspirators also toured competitors' Broiler complexes, which allowed Defendants and the Co-Conspirators to obtain confidential business methods employed by their competitors.   While such tours were often framed as "best practices" information exchanges, they also provided Defendants' and the Co-Conspirators' senior executives the opportunity to conspire.

214.   In January 2008, Defendants and the Co-Conspirators attended the International Poultry Expo conference in Atlanta.  Over 99.4% of major Broiler producers participated in the conference, including numerous Defendants and their Co-Conspirators, their employees, and some of their senior executives.

215.   A few days after attending the conference, both Pilgrim's Pride and Tyson stated to the Broiler industry that the companies would continue to cut production.  Tyson's CEO Dick Bond announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially."  Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate an industry-wide reduction in supply, as the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.

216. The next day, Pilgrim's Pride executive Rick Cogdill stated publicly on an earnings call that Pilgrim's Pride had done its part in 2007 by reducing production 5% so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system." Cogdill explained that Pilgrim's Pride alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's Pride expense.

217. During the earnings call Cogdill also urged competitors to do their part in reducing Broiler industry supply, stating "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

218. On a January 31, 2008 earnings call, Sanderson Farms CEO Joe Sanderson explained that he anticipated the industry would cut production. Specifically, Mr. Sanderson predicted that a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

219. In March 2008, senior executives from Defendants and the Co-Conspirators, including Pilgrim's Pride's newly-installed CEO, Clint Rivers, Tyson's Senior Vice President Donnie Smith, Fieldale's President Thomas Hensley, Amick's President and CEO Ben Harrison, and Case Foods' CEO Tom Shelton, met at an Executive Committee meeting of the National Chicken Council's Board of Directors in Washington, D.C.

220. Shortly after that meeting, Pilgrim's Pride again urged other producers to cut

overall industry supply. Pilgrim's Pride proceeded with the production cuts. On March 12, 2008, Pilgrim's Pride's CEO publicly announced the closure of seven Broiler facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply."

221.     Under competitive conditions, other Broiler producers would typically respond to Pilgrim's Pride's substantial supply cuts by increasing their production. However, the other Defendants and Co-Conspirators joined Pilgrim's Pride and Tyson's production reduction Conspiracy.

222.     Following Pilgrim's Pride's announcement, a series of production cuts were publicly announced by other Defendants and/or Co-Conspirators between April 3 and April 11, 2008, specifically:

> a)     On April 3, 2008, Fieldale publicly announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance." As a privately-held company, there was no reason—other than signaling to fellow producers that it was following through on the Conspiracy—to disclose its production plans.
>
> b)     Simmons publicly announced in a press release a 6% reduction in production throughout its processing plants.
>
> c)     Cagle's Inc. (later acquired by Koch) announced in a press release a 4% reduction in processing of Broilers, noting that the cut "will reduce product being sold through less profitable commodity outlets."

d)      Wayne Farms, O.K. Foods, and Koch each announced 2-8% reductions in production.

223.    Here again, there was no reason—other than to signal to fellow producers that they were following through on the Conspiracy—for these companies to publicly disclose their respective production plans.

224.    Several other Broiler producers cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce their actions.  For instance, in May 2008 at a BMO Capital Markets Agriculture & Protein Conference presentation, Sanderson Farms CEO Joe Sanderson stated—in the presence of several competitors including Pilgrim's Pride and Tyson—that he had observed "for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. . . I know some companies have cut back and have not announced."  Such knowledge of non-public production cuts by competitors is highly suggestive of communications among Broiler producers through secret direct communications using Agri Stats as a facilitator.

225.    Beginning in April 2008, the weekly hatchery data started to show declines in egg sets and chick placements, confirming that Defendants had begun executing their announced intentions to reduce the production of Broilers.

226.    In May 2008, the *Wall Street Journal* noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines."  The article also noted "[i]t is unusual for egg sets to decline at this time of year."

227.    Despite the large number of coordinated production cuts (both announced and unannounced) by producers in April 2008, Pilgrim's Pride's CEO, Clint Rivers, encouraged further

action by the industry at a May 15, 2008, speech at the BMO Capital Markets.  Rivers announced that he hoped to see the Broiler industry continue to cut production to help the industry return to profitability, stating "he would like the industry to trim total production by 3%-4%."

228.     Defendants and the Co-Conspirators collectively began making unprecedented cuts at the top of the supply chain in the form of jointly and collusively reducing the supply of "breeder flocks" in the market.  Defendants' and the Co-Conspirators collective actions effectively eliminated their ability to meaningfully increase Broiler supply for *18 months or more* by destroying breeder hens in their breeder flocks responsible for supplying the eggs Defendants and the Co-Conspirators raised into Broilers.

229.     This reduction of industry capacity—particularly at the breeder flock level, where such efforts would be most effective—was a mechanism to increase Defendants' and the Co-Conspirators' profits.  Defendants' and the Co-Conspirators efforts were supported by public statements made by their executives in which they expressed their respective commitment to production cuts.  Moreover, many of Defendants' and the Co-Conspirators' executives called for a new era of "discipline" by making public statements that deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.[3]

230.     Defendants' and the Co-Conspirators' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry

---

[3] While spearheaded by the CEOs and senior personnel of Tyson and Pilgrim's Pride, public discussion of industry conditions was not limited to the executives of larger, publicly-held Defendants and the Co-Conspirators.  For example, Harrison CEO Mike Welch and Sanderson Farms COO Lampkin Butts participated as panelists at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose Vice President, Mike Donohue, was in the audience).

practice. Notably, a leading industry publication commented in early 2009 that Broiler "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore." Yet in 2008, for "the first time in decades, total Broiler production [] remained virtually unchanged from the year before."

231.    In June 2008, during a media conference call involving numerous Broiler industry executives, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year." Mr. Hickman explained that previous cutbacks of Broiler breeder flocks were insufficient, "so liquidation is in round two."

232.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Like many other executives, Wayne Farms President & CEO Elton Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only four days after Peco Foods' CEO Hickman suggested further cuts were needed.

233.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new Broiler plant in northeastern Colorado that it had just announced in April 2008 would employ about 1,000 people. Foster Farms' CEO, Don Jackson, blamed increased grain and fuel prices as the reason for the company's decision.

234.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

235.    On August 11, 2008, Pilgrim's Pride announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's Pride's press release

noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."  The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.  Pilgrim's Pride stated that it would keep both plants idle until "industry margins can be sustained at more normalized levels of profitability."

236.    In August 2008, Raeford announced publicly, as reported by the Charlotte Observer newspaper, that it would begin reducing its Broiler production by 5%.  The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand."  A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its Broiler production from 2001 to 2007.

237.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand."  By September 2008, Broiler industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

238.    On October 10, 2008, in response to a USDA report of falling egg sets in the Broiler industry, Pilgrim's Pride told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

239.    During the fall of 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

240.     On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.   Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

241.     By December 23, 2008, it was reported that Tyson had cut its production by 5%. Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

242.     In a February 18, 2009 interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.   We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

243.     Seeing further cuts from smaller producers in the industry led Pilgrim's Pride to announce historically large cuts to its production in February 2009.   In a press release, Pilgrim's Pride announced the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, which reduced the total pounds of Broilers it produced by 9-10%.

244.     Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Tyson, Pilgrim's Pride, Perdue, Simmons, Raeford, Cagle's (later bought by Koch), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's Pride).   Other companies reduced their planned production levels or delayed the planned opening of new Broiler complexes.

245.     Defendants' and the Co-Conspirators production cuts in 2008 and early 2009 did not just reduce the pounds of Broilers they produced.   The vertically integrated Defendants and

the Co-Conspirators had the ability to manipulate supply in the Broiler market at one or more stages of the supply chain. At the top of the supply chain, Defendants and the Co-Conspirators could most effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier-than-optimum age. Reducing breeder flocks had the most significant and long-lasting effect on supply of Broilers in the market.

246. Because breeder flocks were created from a limited pool of so-called "grandparent" Broilers from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time—anywhere from six to eighteen months, or more—to re-populate a breeder flock that has been reduced through early culling. While Defendants and the Co-Conspirators continued to use their traditional methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants), the Conspiracy was cemented by the long-term effects of breeder flock reductions.

247. Defendants' and the Co-Conspirators' self-imposed restriction on their ability to ramp up production for years to come by substantially reducing their breeder flocks is shown in the highlighted section of the graph below:



248.    The effect of the supply cuts on Broiler pricing in 2008 and the first months of 2009 was clear—during the worst recession in generations, Broiler prices rose through mid to late 2008, staying at or near all-time highs until late 2009.  For instance, by May 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

249.    During 2009 and 2010, Defendants' and the Co-Conspirators senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo, and encouraged continued "production discipline," Defendants' and the Co-Conspirators' euphemism for limiting Broiler supply.

250.    As prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades. The rising production by producers in early 2010 led to a reported oversupply of Broilers that

began to depress prices by late 2010. Having learned the value of coordinated supply reductions in 2008, Defendants and the Co-Conspirators were quick to react with a new round of publicly announced production cuts in the first half of 2011, which quickly helped prices recover.

251. Defendants and the Co-Conspirators engaged in a second wave of coordinated production cuts in 2011 and 2012 that included further substantial destruction of industry breeder flocks. Defendants and the Co-Conspirators also continued to limit the United States Broiler supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess breeder flocks to Mexico—even when doing so was against their independent economic interest.

252. In addition to limiting its own production, in early 2011 Tyson, embarked on a strategy to absorb the excess supply of its competitors. Tyson called the strategy "Buy vs. Grow."

253. Tyson's Buy vs. Grow strategy allowed Tyson to purchase excess production from its competitors to avoid the depression of prices that would occur had the excess production been sold on the open market. The strategy also served the dual purpose of allowing Tyson to communicate the amount of Broilers it would be willing to purchase from competitors in the current and future months, thereby allowing Tyson's competitors to calculate the amount of product that would *not* be purchased by Tyson and that should therefore be cut.

254. It would have been cheaper (on a cost per pound basis) for Tyson to grow its own Broilers instead of buying them from a competitor. But, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to control supply and production in the Broiler industry and reap the benefit of higher market prices for Broilers.

255. On January 24-26, 2011, Defendants' and the Co-Conspirators senior executives, including Tyson's CEO Donnie Smith, attended the International Poultry Expo ("IPE") in Atlanta,

Georgia. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "the broiler industry is currently at record high weekly slaughter volumes" and Aho warned "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation . . . . The market is calling for around a 5% reduction in chicken production."

256. On a February 16, 2011 Cagle's[4] earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

257. On March 7, 2011, Raeford announced a 10% reduction in egg sets that began in early February.

258. On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant, blaming high grain prices.

259. On April 15, 2011, Mountaire announced the abandonment of a planned capacity increase. Mountaire's President Paul Downes explained that "the only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. . . . I think that's what we're going to see."

260. Downes' view of the state of the Broiler industry was echoed, and amplified, by Sanderson Farms' CEO, Joe Sanderson, who stated on a May 24, 2011 earnings call that "the deal is that the industry . . . cannot sustain losses like they are sustaining for a long period of time . . .

---

[4] Cagle's is a Georgia-based integrator whose assets were bought by Koch in 2012 following Cagle's bankruptcy.

The only way to stop losses with $7 corn is to reduce production and get prices up." Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

261.    Sanderson Farms' May 2011 comments came roughly one week after the BMO Farm to Market Conference in New York City. The conference included a presentation during which the CEO of Pilgrim's Pride, Bill Lovette, noted Pilgrim's Pride's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand. Lovette's presentation also noted Pilgrim's Pride's shift away from fixed-rate contracts to market-based pricing.

262.    This shift began as early as 2008 and was directed principally at distributors and grocery store customers. This coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helped facilitate a market-wide antitrust conspiracy. This was true even with respect to restaurants, like Golden Corral, and other purchasers that continued to enter into term contracts with Defendants.

263.    On a June 6, 2011 earnings call, Cagle's said that "the industry must lower supply in order to offset reduced demand and to support higher market prices." Later that month, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

264.    In 2011, Mar-Jac reduced its production 10% and reported that other Broiler producers were doing so as well. Fieldale also reduced its production by an unspecified amount.

265.    In June 2011, Tyson began pulling eggs from its incubators to reduce Broiler volumes.

266.     On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices."

267.     On July 29, 2011, Pilgrim's Pride announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees.  Pilgrim's Pride's President & CEO Bill Lovette explained that "we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken . . . A key component of that effort is improving our capacity utilization through production consolidation and other operational changes."

268.     On an August 1, 2011 earnings call, Sanderson Farms' CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of four percent beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson also stated that it "wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November . . . Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that the industry has in place."

269.     A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . .  Our goal is to match supply to demand.  And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

270.     On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

271.    On September 15, 2011, Case Foods began breaking eggs to reduce its production. It continued these production cuts into 2012.

272.    In early October 2011, Defendants' and the Co-Conspirators' senior executives attended the National Chicken Council's Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the Broiler industry. The panel included senior executives from Perdue and Koch. Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion. Getting better prices from retailers was another."

273.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

274.    In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

275.    Throughout 2012, Defendants and the Co-Conspirators continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their Conspiracy. In the first quarter of 2012, for example, Defendants' and the Co-Conspirators' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the IPE. On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' and the Co-Conspirators' senior executives, met again in Washington, D.C.

276.    On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

277.    Defendants' and the Co-Conspirators' actions, taken collectively and not in

isolation, demonstrated an unprecedented level of coordination and industry "production discipline."

278.    Defendants' and the Co-Conspirators' collective output-restriction caused a slowing in overall Broiler pounds produced during the Conspiracy Period, in sharp contrast to the historic trend of steady annual production increases.  The overall effect is depicted in the graph below, drawn from USDA data, showing that while overall Broiler production grew a total of 21% from 2000 to 2008, it then slowed to a total of roughly 10% from 2008 through 2016:



279.    Indeed, Defendants' and the Co-Conspirators' cuts to the Broiler breeder flocks in 2011-2012 drove overall Broiler supply flocks down to levels not seen for almost two decades, as reflected in the highlighted section of the following graph.  Yet, Defendants' production of Small Bird Broilers significantly increased in the 2011-2013 period and remained elevated throughout the remainder of the Conspiracy Period.



280. Even with the overall reduction in Broiler supply, the higher broiler prices in the market by September 2012 were not justified because the costs of Defendants' and the Co-Conspirators' primary inputs, corn and soybean meal, which by the fourth quarter of 2012 had dropped significantly in price following near-record highs in the summer of 2012.

281. Defendants and the Co-Conspirators adopted multiple additional strategies to strengthen and sustain the Conspiracy.

282. Defendants and the Co-Conspirators directly purchased Broilers from one another and from smaller producers to meet their respective sales needs. This tactic allowed Defendants and the Co-Conspirators to absorb excess supply that could potentially depress market prices. These inter-Defendant/Co-Conspirator purchases also allowed Defendants and the Co-Conspirators to maintain market share.

283. Additionally, the inter-Defendant/Co-Conspirator sales provided an opportunity for Defendants and the Co-Conspirators to discuss prices with competitors. In many instances large inter-Defendant/co-conspirator purchases were negotiated by Defendants' and the Co-

51

Conspirators' senior level executives, thereby providing additional opportunities to conspire.

284. Tyson's implementation in 2011 of its "Buy vs. Grow" strategy is a prime example of how inter-Defendant/Co-Conspirator sales were part and parcel of the Conspiracy. Indeed, only a few years prior to adopting the "Buy vs. Grow" strategy, Tyson had derided a similar strategy as a "stupid" subsidization of competitors' growth.

285. In a November 5, 2012 interview, Fieldale's President, Thomas Hensley, noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them."

286. Broiler prices significantly increased during the Conspiracy Period as a result of Defendants' and the Co-Conspirators' coordinated reduction in the supply of Broilers. This was contrary to pricing patterns prior to the Conspiracy Period, and contrary to what would be expected in a competitive market. The rise in Broiler prices relative to input costs led to record profits for Defendants and the Co-Conspirators.

287. Defendants and the Co-Conspirators also were able to take advantage of their coordinated reduction in the supply of Broilers in contract negotiations with customers like Golden Corral, even when there was no actual reduction in the supply of Broilers. This was especially the case with Small Birds.

288. For example, as part of their collective goal to increase the prices of Broilers, Defendants and the Co-Conspirators coordinated inflated prices to restaurants and other contract purchasers in the time period beginning at least as early as 2012 and continuing through at least 2017. One of the primary explanations Defendants and the Co-Conspirators presented for these

inflated prices was what they said was a reduction in the supply of Broilers. Defendants and the Co-Conspirators were able to point to the actual supply reduction that they orchestrated for Broilers in the 2011-2012 timeframe. Yet, at the same time, the number of Small Birds killed increased significantly in the 2011-2013 period and remained elevated throughout the remainder of the Conspiracy Period.

289. Defendants and the Co-Conspirators also used their coordinated false explanation of supply reduction for their elevated prices of Broilers even for those restaurants that did not purchase Small Birds. Through these coordinated misrepresentations, Defendants and the Co-Conspirators were able to persuade restaurant chains to accept higher prices for Broiler products.

## B. Defendants' and Co-Conspirators' Collusive Manipulation of the Georgia Dock Price Index

290. Wholesale Broiler prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the GDA, and the USDA. In addition to these reports, Agri Stats also collected detailed pricing information through its subsidiary Express Markets, Inc. ("EMI"). 5

291. The Georgia Dock, USDA Composite, and Urner Barry all measured the same (or very similar) size and grade of Broilers. These three indices set prices for both the "whole bird" and various parts of the Broiler (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology.

292. Urner Barry, a subscription-based report, collected and published daily price

---

[5] EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats' reports for Defendants and the Co-Conspirators, EMI released daily pricing data to both Defendants and the Co-Conspirators and potential purchasers of Broilers, though the reporting service costs thousands of dollars and was not publicly available. EMI reports captured all transactions by Broiler producers, who automatically transmitted transactional invoice information electronically to EMI.

information for Broilers.  The USDA's Composite price index published Broiler price information on a weekly basis.  USDA's Composite price index was publicly available at no cost.

293.    The USDA and Urner Barry's Broiler price indices were based upon a system of double verification, which includes telephonic and written surveys of all or nearly all Broiler producers, but also verification of reported prices from purchasers such as brokers and customers. Significantly, however, the reported prices were wholesale prices, and did not include prices that suppliers charged restaurant customers like Golden Corral.

294.    The most detailed price report was not publicly available and was produced by Agri Stats and its subsidiary, EMI.  According to a May 2010 FarmEcon study, EMI's pricing report included "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it was based on actual sales invoices from Broiler companies.

295.    Compared to the other two indices available to Broiler purchasers, the Georgia Dock benchmark price index was highly susceptible to manipulation by the Georgia Dock Producers.

296.    Unlike the USDA Composite or Urner Barry indices that used data from numerous producers and buyers on both sides of the market, the Georgia Dock benchmark price was a self-reported number from a handful of producers including the Georgia Dock Producers.

297.    The GDA used the Georgia Dock Producers' price quotes to determine the Georgia Dock index using a formula based on each company's respective market share in Georgia.[6]

298.    In compiling the Georgia Dock benchmark price, there was no team of economists

---

[6] During the Conspiracy Period, the Georgia Dock Producers' respective Georgia market shares were:  Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton, Mar- Jac, Harrison, and Wayne Farms, each with a 5% market share.

or statisticians surveying buyers and sellers in the national Broiler market.  To compile the Georgia

Dock price index, a GDA employee simply contacted participating Broiler producers each week

to collect verbal price quotes, which were supposed to reflect their actual sales prices.  A single

price was given by each Broiler producer company and it was accepted without any verification

of actual invoices or any other form of auditing to verify accuracy.[7]

299.    Historically, the Georgia Dock benchmark price was highly correlated to the USDA

Composite and Urner Barry indices.  However, during the Conspiracy Period, and after at least a

decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock's

price volatility virtually disappeared.[8]  The following graph compares prices of the various indices

both before and during the Conspiracy Period, and depicts the Georgia Dock's divergence from

the other indices:

---

[7] In response to a press inquiry, the GDA explained its failure to audit any self-reported data from
Defendants by stating, "We don't see any reason they would submit information that wasn't
truthful."

[8] The USDA Composite and Urner Barry indices remained positively correlated with each other.



300.    The GDA used the "one cent Rule" where outlier prices deviating by more than one cent from the initial dock price were excluded from the final Georgia Dock price.  Therefore, the significant difference between the Georgia Dock price index and other Broiler price indices in more recent years cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to the GDA.  Instead, the deviation of the Georgia Dock price index from other indices can only be attributed to all or nearly all of the Georgia Dock Producers participation in collectively submitting artificially high and nearly identical Broiler prices to the GDA.

301.    Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from Broiler companies, Arty Schronce, was deeply concerned.  In a September 2016 internal GDA memorandum—disclosed publicly for the first time on November 17, 2016 in a *Washington Post* article—Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia

Department of Agriculture."  Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided.  However, I have come to question the validity of some of the information provided."

302.    Until late 2016, the Georgia Dock pricing methodology was not publicly available. Broiler purchasers, whose transactions with Defendants and the Co-Conspirators were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of Broilers.  Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many Broiler purchasers erroneously believed the Georgia Dock price to be a USDA price.

303.    The reality was that the Georgia Dock price was simply whatever the Georgia Dock Producers said it was.  Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Producers told the GDA that the sales price of their Broilers was now $2, the Georgia Dock price was $2—and the prices that purchasers paid for Broilers increased commensurately.

304.    Senior executives from eight of the ten companies who participated in the Georgia Dock price submissions were members of a non-public, non-governmental "Georgia Dock Advisory Board," that advised the GDA on the Georgia Dock price.

305.     The Advisory Board played a role in the compilation and manipulation of the Georgia Dock benchmark price index.  From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale), Mike Welch (CEO and President, Harrison), Jerry Lane (CEO, Claxton), Jayson Penn (EVP Sales and Operations, Pilgrim's Pride), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch).

306.    The Advisory Board gave the Georgia Dock Producers a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

307.    The existence and conduct of this Advisory Board was not known to Broiler purchasers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology.

308.    Defendants and the Co-Conspirators used the artificially inflated Georgia Dock prices to effectuate price increases even for those customers that did not set their Broiler prices based on the Georgia Dock index.  This was especially the case during the later part of the conspiracy when the Georgia Dock index deviated so dramatically from the Urner Berry and USDA Composite indices.  This was true, moreover, even with respect to Defendants that did not submit pricing information to Georgia Dock.

309.    For example, when Defendants and the Co-Conspirators sought to explain why they were "forced" to increase prices to contract purchasers of Broilers, like Golden Corral, they relied on the artificially inflated Georgia Dock index to justify the price increases.  Defendants and the Co-Conspirators independently could not have provided restaurants with the same false explanation for price increases without coordinating the messaging.

310.    In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled.  The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016.

311.    On July 19-20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price.  The USDA officials shared their conclusion

that GDA could no longer simply accept Broiler prices obtained from Defendants and their Co-Conspirators without verification, and instead would have to verify invoice-level data to confirm reported prices. USDA officials requested that the GDA provide the USDA with data from Broiler producers to "test and review" the Georgia Dock price for accuracy.

312.    In 2016, high-level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock. For instance, in a July 27, 2016 report, GDA Director of Regulatory Compliance & Budget, Alec Asbridge, concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review."

313.    On August 5, 2016 a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA. The sanitized August 5 report removed references to the existence of factors in the Broiler industry eliciting "anti-trust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

314.    In the fall of 2016, under pressure from the USDA and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology. After the Georgia Dock Producers balked at the GDA's new methodology—which required them to verify and attest to the accuracy of their price quotes—the GDA halted the Georgia Dock benchmark price index altogether, citing a "lack of submissions" under the new reporting requirements.

315.    In November 2016, following intense scrutiny from the USDA and news media, the GDA suspended reporting the Georgia Dock benchmark price index.

C.     **The Bid-Rigging Conduct**

316.     Beginning at least as early as 2012 and continuing at least into 2019, Defendants and the Co-Conspirators engaged in a conspiracy to rig bids submitted for Broilers sold to restaurants and other contract purchasers, with the intent to artificially inflate the prices paid by these customers.

317.     As part of its procurement process, Golden Corral, like many restaurants, requested proposals or bids from Defendants and the Co-Conspirators for the volume of chicken needed to support the Golden Corral restaurant system.  Golden Corral received bids from Defendants and the Co-Conspirators throughout the Bid-Rigging Conduct Period.

318.     Golden Corral expected Defendants and the Co-Conspirators to engage in a competitive bidding process, which when complete, would allow Golden Corral to award its contracts to the most competitive bidder(s).  Defendants and the Co-Conspirators, however, recognized that the restaurant market offered an additional opportunity to effectuate their Conspiracy.

319.     Defendants' and the Co-Conspirators' bid-rigging conduct took multiple forms.  At its most basic level, Defendants and the Co-Conspirators exchanged confidential information with each other regarding the bids they were submitting, or intended to submit, to specific identified restaurant customers, so that all supposedly competitive bids were aligned.

320.     On June 3, 2020, the Department of Justice issued an Indictment against officers of certain Defendants in the District of Colorado founded on Defendants' and the Co-Conspirators' bid-rigging conduct (the "June Indictment"). The June Indictment charged Jayson Penn, President and CEO of Pilgrim's Pride, Mikell Fries, President of Claxton, Scott Brady, Vice President of Claxton, and Roger Austin Vice President of Pilgrim's Pride (the "First Indicted Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other

price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[9]

321. Specifically, the June Indictment alleged that from at least 2012 through at least 2017, the First Indicted Defendants and at least seven broiler chicken suppliers conspired:

a) to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

b) to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

c) to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States.

322. The June Indictment expressly identified as victims of the First Indicted Defendants' conspiracy "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices or other price-related terms, including discount levels, with Suppliers directly."

---

[9] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Col. June 2, 2020) [D.E. 1].

323.    The June Indictment set forth a series of communications between Defendants and the Co-Conspirators—via phone, email and text messages—sharing and coordinating confidential bidding and pricing information in connection with multiple restaurant and grocer victims' requests for bids.

324.    On October 7, 2020, the Department of Justice issued a Superseding Indictment in the District of Colorado, again, founded on Defendants' bid-rigging conduct (the "Superseding Indictment").    The Superseding Indictment charged six additional executives, including Tim Mulrenin (Tyson/Perdue), Bill Kantola (Koch), Jimmie Little (Pilgrim's Pride), Bill Lovette (Pilgrim's Pride), Brian Roberts (Tyson/Case Foods), and Ric Blake (George's) (together with the First Indicted Defendants, the "Criminal Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[10]

325.    The Superseding Indictment expanded the bid-rigging conduct period from at least as early as 2012 through at least early 2019, and stated that the bid-rigging conduct included but was not limited to ten different broiler chicken suppliers.

326.    The Superseding Indictment also charged Defendant Jimmie Little with two additional counts for False Statements and Obstruction of Justice.    The Superseding Indictment alleged that during an interview with special agents of the United States Department of Commerce and the Federal Bureau of Investigation, Little "knowingly and willfully made false statements to federal law enforcement agents."    Specifically, "LITTLE stated words to the effect that (a) he had no contact with individuals at competing Suppliers outside of speaking to the individuals at

---

[10] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Col. June 2, 2020) [D.E. 101].

industry trade shows; and (b) he had not called-or sent text messages to—any individuals at competing Suppliers. The Statements were false. As LITTLE then and there knew, he indeed had contact with individuals at competing Suppliers outside of trade shows, and had called and sent text messages to individuals at competing Suppliers."

327.    The Obstruction of Justice count alleges that "LITTLE corruptly obstructed, influenced and impeded official proceedings, and corruptly attempted to obstruct, influence, and impede official proceedings, pending and about to be instituted in the District of Colorado, *to wit*, the pending grand jury investigation of price fixing in the broiler chicken industry, the pending prosecution of four individuals for conspiring to fix prices in the broiler chicken industry, and the then-about-to-be-instituted prosecution of LITTLE for conspiring to fix prices in the broiler chicken industry."

328.    On October 13, 2020, the Department of Justice filed an Information charging Pilgrim's Pride.[11] The Information states that "[b]eginning at least as early as 2012 and continuing through at least early 2019 . . . [Pilgrim's Pride] and its co-conspirators entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by Defendant and its co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."

329.    As a result of the bid-rigging conduct, pricing for Broilers to contract-based customers, including Golden Corral, was elevated. Golden Corral was injured in its business or

---

[11] *United States of America v. Pilgrim's Pride Corporation.,* Crim. Action No. 1:20-cr-00330-RM (D. Col. October 14, 2020) [D.E. 1].

property by paying more for Broilers than it would have paid in the absence of the Conspiracy.

> **D.    Agri Stats Actively Facilitated Defendants' and the Co-Conspirators' Conspiracy by Providing Data Necessary to Effectuate, Monitor and Enforce the Conspiracy**

> (i)    Agri Stats Reports

330.    Defendants' and the Co-Conspirators Conspiracy was successfully facilitated, monitored, and policed by using reports purchased, at significant cost, from Agri Stats.

331.    Every Defendant and Co-Conspirator participated in Agri Stats.  Additionally, certain entities acquired by Defendants and the Co-Conspirators participated in Agri Stats, including Cagle's, Inc., BC Natural Chicken, Peterson Farms, and Townsend's.

332.    Agri Stats described itself as a service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

333.    Agri Stats collected detailed, proprietary data from all Defendants and Co-Conspirators, including housing used, breed of chicks, average size, and production and breeder flock levels on a regular basis, typically weekly.  Agri Stats audited and verified the data, and ultimately reported back to Defendants and Co-Conspirators detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks.

334.    Although certain Defendants and Co-Conspirators purchased information provided by Agri Stats before 2008, the output restriction part of Defendants' Conspiracy began when Tyson—which had stopped using Agri Stats sometime in the wake of a $1.3 billion jury verdict in 2004 against it for a conspiracy to manipulate pay to cattle farmers—became a subscriber again in early 2008, around the start of the Conspiracy Period.

335.    Tyson's resubscription in early 2008 resulted in significantly increased fee income to Agri Stats as Tyson was by far the largest and most lucrative subscriber.

336.    Agri Stats' survey methodology involved direct electronic data submissions from

and to Defendants of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each Broiler producer on a weekly and monthly basis.

337.    Each Defendant and Co-Conspirator received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.  Defendants' and Co-Conspirators' top executives received Agri Stats' monthly "Bottom Line" Reports (which, for a period of time was called the "Executive Report") that contained one row for each Broiler company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (*i.e.*, overhead), interest expense, and other key operational information related to sales, revenues and costs.

338.    The information available to Defendants and the Co-Conspirators in these Agri Stats reports would not typically be disclosed among competitors in a competitive market. Although the USDA and various other entities published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. Broiler industry, Agri Stats was unique in that it contained detailed information to accurately determine producer-specific production, costs, and general efficiency.

339.    Agri Stats purported to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific Broiler complexes by name.  The report would not identify other Broiler producers' complexes by name, but instead would list competitors' complexes by number.  Sanderson Farms CEO Joe Sanderson claimed "Agri Stats is a benchmarking service that we submit data to.  Almost everyone in our industry does as well.  And we get the data back.  It's anonymous—the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over

the industry."

340.    While Agri Stats reported superficially "anonymized" individual producer information, they were sufficiently detailed so that any reasonably-informed producer could discern the identity of its competitors' Broiler complexes. For example, Case Foods was able to de-anonymize Agri Stats' bottom line reports and determine its competitors' rankings.

341.    Agri Stats reports included facility-level data for over 100 of Defendants' and the Co-Conspirators' Broiler integrated production facilities. Most of these vast facilities, referred to as "complexes," included housing for Defendants' and the Co-Conspirators' breeder flocks and hatcheries where breeder flock hens lay the eggs that would ultimately become Broilers.

342.    Specifically, Agri Stats' reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each Broiler complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself. For example, "Region 20" includes "Sub-Region 21 – Upper Mid Atlantic," identifying, with a unique number, sixteen Broiler complexes, including four Tyson complexes, four Perdue complexes, three Mountaire complexes, two Pilgrim's Pride complexes, and one George's complex.[12]

---

[12] Agri Stats reports also included specific data for Defendants' and Co-Conspirators' Broiler complexes (listed by producer and location) in: North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10") (which is composed solely of Defendant Foster Farms' three complexes). While Agri Stats reports were sufficiently detailed such that any reasonably informed producer could discern its competitors' information, Foster Farms' identity is particularly obvious because Foster Farms is the only producer in its region included in the reports.

343. Agri Stats' coding system made it easy for Defendants' and Co-Conspirators' employees—some of whom, including senior executives at both Wayne Farms and Pilgrim's Pride, used to work at Agri Stats—to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

344. In fact, Agri Stats' coding system never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant or Co-Conspirator deciphered the numeric code for a given competitor's complex, that Defendant or Co-Conspirator had the ability to know their competitor's data indefinitely.

345. According to an expert witness for Pilgrim's in contract-farmer litigation against Pilgrim's, "[p]robably no one in the industry would know better than [Agri Stats economist] Mike Donahue [as to whether Broiler production increased in 2008] because EMI is the same company as Agri Stats, which is the company that gathers operating statistics from virtually every company in the broiler industry. And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."

346. Information helping Defendants and the Co-Conspirators assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age of the breeder hens whose eggs, when hatched, become Broilers. This data showed how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants and the Co-Conspirators insight into how much longer that flock's capacity to lay eggs will impact the supply of Broilers available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" was available each month,

knowing the average age of a given flock from month to month helped Defendants and the Co-Conspirators determine when flocks are being slaughtered and removed from the supply chain.

347.    Similarly, in some reports, Agri Stats showed the number of egg-laying hens, or pullets, that a competitor is placing on farms.  This largely determined the number of eggs that would be laid, and therefore how many Broilers would be hatched and grown – a key marker of future production.

348.    Other sections of the Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."  Knowing the number of complexes each Defendant and Co-Conspirator operated in each sub-region allowed Defendants and Co-Conspirators to assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

349.    When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist expressed his "shock[] at the incredible detail" of the information presented in the reports.

350.    Thus Agri Stats facilitated Defendants' and the Co-Conspirators' access to "massive amounts" of each other's competitively sensitive information, including detailed information concerning their competitors' breeder flocks, and other production, capacity, feed, sales, and cost data.

351.    Defendants and the Co-Conspirators knew that when they provided internal, confidential information to Agri Stats, other subscriber producers would be able to access that information and identify the Defendant or Co-Conspirator that submitted it.

352.    Providing such specific, commercially-sensitive information to Agri Stats, in conjunction with Agri Stats' dissemination of the information in a manner where producers can

identify each competitor's data, constituted an unreasonable, anticompetitive restraint of trade.

(ii)    The Confidential Nature of the Agri Stats Reports

353.    Agri Stats reports were not publicly available and Defendants and Co-Conspirators closely guarded from those outside the industry the reports' contents and the degree of Defendants' and the Co-Conspirators' participation in Agri Stats' data-gathering and data-dissemination processes.

354.    While Agri Stats reports were closely guarded by Defendants and Co-Conspirators, after an extensive investigation, Golden Corral believes that Agri Stats reports included at a minimum the following categories of information:

a)  Name of genetics company used for primary breeder stock;

b)  Hatchery capacity, costs, and age of Broiler breeder flocks;

c)  Feed Manufacturing, Delivery and Formulation data, including corn and soybean meal costs;

d)  Growout information for Broiler "flocks" provided to contract farmers, including the number of Broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of Broiler), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of Broiler housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

e)  Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of Broilers at slaughter, weight of Broilers at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

f)  Inventory levels of Broilers;

g)  Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail,

foodservice, etc.); and

h) Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

355.    Portions of Agri Stats' reports have found their way into the public record.  One such instance is a presentation by Dr. Steve Bolen, an executive with Cobb-Vantress, a bird genetics company wholly-owned by Tyson Foods, Inc., in which Dr. Bolen disclosed a portion of an Agri Stats report illustrated below:



356.    The above table includes data from Broiler production complexes, which are typically located within a 50-mile radius of a Broiler company's feed mill and processing plant. The table contains data for a single month – March 2014.  The report provided the various yields of the Defendants' and the Co-Conspirators' facilities for various cuts of meat (breast, fillets and

tenders).

357.    Defendants and the Co-Conspirators rarely mentioned their exchange of proprietary information with one another through Agri Stats.  However, on occasion (such as during earnings or investor conference calls) Defendants and the Co-Conspirators have provided glimpses into their use of Agri Stats information.

358.    For example, in May 2008, Sanderson Farms reported "every year we review our operations and every facet within Agristats. . . we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call Agristats."

359.    In December 2009, Sanderson Farms CEO Joe Sanderson commented "based on what I see in Agr[i] stats nobody is planning on . . . ramping up.  I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."

360.    In May 2011, Mr. Sanderson stated on an earnings call, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."  Sanderson also stated that he felt "confident that we are going to see cutbacks" based on Agri Stats data.  Sanderson also explained "[t]ypically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."

361.    Tyson noted in a December 2014 investor presentation that "when you talk about the chicken cycle, most people will look at the cyclicality.  It's very profitable right now.  And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack.  We can tell that through Agri Stats.  Now at the same time, when there is more poultry available and the industry may not be as

profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

        (iii)    <u>Agri Stats Allowed Defendants and Co-Conspirators to Monitor Competitors to Prevent Cheating</u>

362.    Agri Stats' critical importance to the Conspiracy lies not only in the fact that it supplied data necessary for Defendants and the Co-Conspirators to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting conspiracies, regardless of industry, are subject to inherent instability in the absence of policing mechanisms. This is true because each individual member of the Conspiracy has the incentive to "cheat" other group members—for example, by boosting Broiler production to capture higher prices even as other producers heed their conspiratorial duty to limit production.

363.    Agri Stats knowingly participated in the producer Defendants' and Co-Conspirators' policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes aided Defendants in determining which complexes are cutting back, and by how much.

364.    For example, if in January a Defendant or Co-Conspirator publicly stated its intention to reduce production, its competitors would be able to tell from the February and March Agri Stats reports whether that Defendant or Co-Conspirator was following through on its conspiratorial agreement. Additionally, Tyson, Pilgrim's Pride, and Sanderson are public companies that reported aggregated data publicly, which competitors could use to match up against the detailed information in the Agri Stats reports in order to identify other specific data from their competitors.

365.    Such detailed statistics—coupled with their regular, in-person meetings with one another, and routine participation in trade association events widely attended by Defendants' and the Co-Conspirators' senior executives—allowed Defendants and the Co-Conspirators to monitor

each other's production figures for any signs of "cheating."

           (iv)    Agri Stats Meetings & Conferences

366.    Agri Stats' role in the Broiler industry Conspiracy extended beyond the collection and dissemination of competitively-sensitive data. It was also an active and knowing participant in, and facilitator of, the Conspiracy.

367.    Agri Stats held regular meetings with each Defendant and Co-Conspirator, which allowed Agri Stats to share non-public, proprietary production information with Defendants and Co-Conspirators. For example, during the Conspiracy Period, Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

368.    The regular Agri Stats meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' and the Co-Conspirators' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' and the Co-Conspirators' hatchery, breeder and feed departments.

369.    During the meeting with Defendants' and the Co-Conspirators' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of Broiler breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants and the Co-Conspirators provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry. Agri Stats also told Defendants' and the Co-Conspirators' executives how much the industry was over- or under-supplying the market and estimated demand, and shared other information based on data Defendants and the Co-Conspirators provided.

370.     Agri Stats' employees also confirmed production data for Defendants and the Co-Conspirators at the numerous trade association meetings where Agri Stats executives present on a regular basis.  For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

371.     For each of their Defendant and Co-Conspirators customers, Agri Stats account managers created a series of data compilations known as "books," based on the competitively-sensitive data that a particular Defendant had submitted to Agri Stats.  Agri Stats maintained at least six "books" for each Defendant and Co-Conspirators: (1) the light-blue "Live" book, with information on the Defendant's or Co-conspirator's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's or Co-conspirator's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's or Co-conspirator's yields; (4) the brown "Profit" book, with information on the Defendant's or Co-conspirator's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's or Co-conspirator's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's or Co-conspirator's sales, revenues and costs.

372.     On a number of occasions, Agri Stats personnel sent copies of one Defendant's or Co-Conspirators' "books" to other Defendants or Co-Conspirators.

373.     Agri Stats also held regular "poultry outlook conferences" for meat industry executives.  Agri Stats employees, including Vice President Michael Donohue and account managers Paul Austin, Paul Bunting and Dana Weatherford, regularly hosted, or presented at, Broiler industry events and investor conferences.  For instance, Agri Stats hosted an April 23, 2015 conference in Atlanta, Georgia which included a presentation by Agri Stats Vice President Sue

Trudell concerning the "broiler market situation and outlook," as well as an analysis of feed and macroeconomic factors. Such presentations were restricted from circulation and were not publicly available outside the invited participants to the poultry outlook conference hosted by EMI.

374. Sanderson Farms also invited Agri Stats employees to make presentations about the industry to Sanderson's own investors. One such presentation was made by Agri Stats Vice President Sue Trudell on October 18, 2013.

375. EMI also held regular invitation-only "Analytics Web Conference" calls.

(v)  Agri Stats Encouraged Defendants' Collusive Behavior

376. In many instances, Agri Stats played the role of industry cheerleader rather than industry benchmarking service, with Agri Stats suggesting specifically how much Broiler production should be cut based on Agri Stats data.

377. July 2012 trial testimony in a lawsuit against Pilgrim's Pride by contract farmers revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied . . . relative . . . to demand."

378. Agri Stats' Vice President Donohue also frequently appeared at industry events, such as the Spring 2011 IPE conference. Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics. Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

379. Donohue also authored articles for the Agri Stats publication EMI Vital Signs. For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzed whether Broiler producers could continue to achieve high profit levels. Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and

production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

380.     Donohue helped forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory.  At the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012." Donahue further commented "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."  Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filling up incubators again," but noted that Agri Stats data indicates the industry was managing its production carefully.

(vi)     <u>Agri Stats Served as a Vehicle for Collusion</u>

381.     Defendants' and the Co-Conspirators' use of Agri Stats to secretly share detailed, highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs constitutes an unreasonable and anticompetitive restraint of trade. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret.

382.     Defendants and the Co-Conspirators exchanged de-anonymized Agri Stats information and reports with one other, identifying for their competitors which data pertained to their respective companies.

383.     The FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors

("FTC/DOJ Guidelines") suggest that Agri Stats is far outside the scope of permissible information sharing among competitors. The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

384. The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports included dozens of categories of detailed information that in a competitive industry would be considered trade secrets. The competitive sensitivity of Agri Stats' reports suggests a particularly high level of antitrust concern.

385. Moreover, Agri Stats reports were issued weekly and/or monthly, and its EMI reports were issued daily, so as to provide nearly current production, sales, and other data to Defendants and the Co-Conspirators. The nature of Broiler breeder flocks is that they predict future Broiler supply. By sharing such information in a way that permits company-by-company identification, Defendants and the Co-Conspirators were in fact sharing future anticipated production information with one another, which clearly causes high antitrust concern.

386. The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20% of each relevant market in which competition may be affected. Here, Defendants and the Co-Conspirators account for approximately 90-95% of Broiler production.

387. One Broiler industry expert testified in a case brought by contract farmers against Broiler producers that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors

is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such, it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed."

388. A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

389. A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats played in Defendants' and the Co-Conspirators' efforts to monitor and police their conspiratorial activity:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other

industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

## VIII.   PLAINTIFF'S CLAIMS ARE TIMELY

### A.   Golden Corral Did Not, and Could Not, Discover the Conspiracy Until 2016 or Later

390.    Golden Corral did not have actual or constructive knowledge of, and could not have discovered, Defendants' and the Co-Conspirators' Conspiracy to restrict the supply of Broilers and to manipulate the Georgia Dock price index until approximately 2016 at the earliest. Golden Corral did not have actual or constructive knowledge of, and could not have discovered, Defendants' and the Co-Conspirators' bid-rigging conduct until June of 2020 when the Department of Justice issued its June Indictment, and October of 2020 when the Department of Justice issued its Superseding Indictment.

391.    Throughout the Conspiracy Period, Defendants and the Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful Conspiracy to fix Broiler prices from Golden Corral through various means, including: (1) non-public meetings; (2) surreptitious communications between Defendants and Co-Conspirators via electronic communications and in-person meetings at trade association meetings (and elsewhere); (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents; (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret; and (5) keeping the existence and nature of their competitor supply restraint and price

discussions from non-conspirators (including customers).

392. Moreover, Defendants and the Co-Conspirators used code words including "capacity discipline" in their public statements to signal one other in furtherance of their Conspiracy to restrain production while shielding their Conspiracy from detection by the public.

393. Defendants and the Co-Conspirators also used pretexts to conceal the Conspiracy. Defendants and the Co-Conspirators affirmatively and falsely attributed rising prices during the Conspiracy Period to, among other things, increases in the price of inputs costs. However, the price increases were actually the result of Defendants' and the Co-Conspirators' collusive and clandestine conduct.

394. During the Conspiracy Period, Defendants and the Co-Conspirators affirmatively made numerous misleading public statements falsely portraying the market for Broilers as a competitive one.

395. By virtue of Defendants and the Co-Conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Golden Corral's claims and causes of action resulting from Defendants' and the Co-Conspirators' unlawful combination and Conspiracy under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

396. With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' and the Co-Conspirators' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain Broiler prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA

had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

397.   Yet even when faced with these public revelations, Defendants and the Co-Conspirators continued to assert the fairness and reliability of the Georgia Dock benchmark price. Not until November 2016 was it disclosed publicly that the Georgia Dock Producers had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price, or that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Producers.   Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' and the Co-Conspirators' Broiler prices before these recent events.

398.   The November 2016 disclosure of Defendants' and the Co-Conspirators' conduct was precipitated by the following series of events.  From late 2014 into 2016, Broiler input costs fell significantly.  Economic theory predicts that in a competitive market, all else being equal, Broiler prices similarly would fall.  However, Broiler prices remained artificially inflated due to Defendants' and the Co-Conspirators' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the GDA.  In November 2016, it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants and Co-Conspirators.  When the GDA declined to do so—citing the industry's and its own lack of interest in verifying prices— USDA began publishing its own Broiler price statistics.

399.   Golden Corral's claims based on Defendants' and the Co-Conspirators' supply

restrictions and manipulation of the Georgia Dock price index were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities during the pendency of direct and indirect purchaser class actions asserted against Defendants and the Co-Conspirators, commencing as early as September 2, 2016.

400.     The statute of limitations relevant to Golden Corral's claims have also been tolled as a result of the criminal indictments filed by the Department of Justice in June 2020 and October 2020.

## IX.      ANTITRUST IMPACT

401.     Defendants' and the Co-Conspirators' Conspiracy, including the bid-rigging conduct, had the following effects, among others:

a)      Price competition was restrained, suppressed and/or eliminated with respect to Broilers;

b)      The supply of Broilers was artificially restrained, manipulated and/or suppressed;

c)      The prices of Broilers were fixed, raised, stabilized or maintained at artificially inflated levels; and

d)      Purchasers of Broilers have been deprived of free and open competition among Defendants.

402.     During the Conspiracy Period, Golden Corral purchased Broilers from certain Defendants and Co-Conspirators, their subsidiaries and affiliates, and entities owned or controlled by Defendants, Co-Conspirators, or Defendants' and Co-Conspirators' subsidiaries and affiliates. As a direct and proximate result of Defendants' and the Co-Conspirators' above-described illegal conduct, Golden Corral was compelled to pay, and did pay, artificially inflated prices for Broilers than would have prevailed in a competitive market.  Golden Corral sustained substantial losses

and damage to its businesses and property in the form of overcharges for Broilers. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## X.  CLAIMS FOR RELIEF AND CAUSES OF ACTION

### COUNT I
### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

403.  Golden Corral incorporates paragraphs 1 through 402 above as if fully set forth herein.

404.  Defendants and their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

405.  Defendants' and the Co-Conspirators' anticompetitive and unlawful acts in furtherance of the Conspiracy were authorized, ordered or executed by their respective directors, officers, agents, employees or representatives, within the course and scope of their duties and employment, or with Defendants' and the Co-Conspirators' actual, apparent or ostensible authority.

406.  At least as early as January 1, 2008, and continuing until at least as late as 2019, the exact dates being unknown to Golden Corral, Defendants and the Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for and/or restrain supply of Broilers, and rig bids and allocate markets for Broilers, thereby creating anticompetitive effects in the market for Broilers.

407.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

408.    As a result of Defendants' and the Co-Conspirators' unlawful conduct, Golden Corral was harmed because it was forced to pay inflated, supracompetitive prices for Broilers.

409.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and the Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth in this Complaint. Defendants' and the Co-Conspirators' Conspiracy had the following effects, among others:

- Price competition in the market for Broilers was restrained, suppressed and/or eliminated in the United States;

- The supply of Broilers was restrained, manipulated and/or suppressed in the United States;

- Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates and all of their Co-Conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Golden Corral directly purchased Broilers from Defendants and their Co-Conspirators. Golden Corral and its divisions, subsidiaries, and affiliates, were therefore deprived of the benefits of free and open competition in the purchase of Broilers.

410.    Defendants and the Co-Conspirators took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers to be higher than they would be but for Defendants' and the Co-Conspirators' conduct. Defendants and the Co-Conspirators also knew and intended that such an artificial

inflation of Broiler prices would cause Golden Corral to pay higher prices for Broilers.

411.    Defendants and the Co-Conspirators also knew and intended that the coordinated increase in bids submitted to Golden Corral would increase the prices paid by Golden Corral.

412.    As a direct and proximate result of Defendants' and the Co-Conspirators' anticompetitive conduct, Golden Corral was injured in its business or property and will continue to be injured in its business and property by paying more for Broilers than it would have paid and will pay in the absence of the Conspiracy.

413.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Golden Corral respectfully requests that the Court:

A.    Enter joint and several judgments against Defendants in favor of Golden Corral;

B.    Award Golden Corral damages in an amount to be determined at trial to the maximum extent allowed under federal antitrust laws, and enter a joint and several judgment in favor of Golden Corral against Defendants in an amount to be trebled as provided by law;

C.    Award Golden Corral post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

D.    Award Golden Corral's attorneys' fees, litigation expenses, and costs, as provided by law; and

E.    Grant Golden Corral such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Golden Corral demands a trial by jury on all issues so triable.

Dated: October 16, 2020

Respectfully submitted,

GOLDEN CORRAL CORPORATION

By: /s/ _Lori P. Lustrin_
Robert W. Turken (*pro hac vice*)
Lori P. Lustrin (*pro hac vice*)
Scott N. Wagner (*pro hac vice*)
**BILZIN SUMBERG BAENA PRICE &**
**AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

Andrew P. Bleiman
Mark I. Fishbein
**MARKS & KLEIN, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: 312-206-5162
Facsimile: 312-420-5568
andrew@marksklein.com
mark@marksklein.com